IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALICIA DURAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:15-CV-3360-D |
| VS. | § | |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION

Plaintiff Alicia Duran ("Duran") brings this action under § 205(g) of the Social

Security Act, 42 U.S.C. § 405(g) (the "Act"), for judicial review of the final decision of the

Commissioner of Social Security ("Commissioner") denying her claim for disability

insurance benefits ("DIB") under Title II of the Act.  For the reasons that follow, the

Commissioner's decision is affirmed.

I

Duran filed an application for DIB under Title II of the Act in July 2012, alleging a

disability beginning May 20, 2008, due to fractured spine, legs that hurt after standing for

long periods of time, limited movement in neck, lump in breast, and pre-diabetic.[1]  The

Commissioner denied Duran's application initially and on reconsideration.  Following a

hearing, the administrative law judge ("ALJ") found that Duran is "not disabled."  The

---

[1]It is undisputed that the relevant time period in this case is from May 20, 2008
(Duran's alleged onset date) through March 31, 2013 (date Duran met the insured status
requirements of the Act).

Appeals Council denied Duran's request for review, and the ALJ's decision became the final decision of the Commissioner.

In making her decision, the ALJ followed the five-step sequential process prescribed in 20 C.F.R. § 416.920(a).  At step one, she found that Duran has not engaged in substantial gainful activity from May 20, 2008 (her alleged onset date) through March 31, 2013 (date she met the insured status requirements of the Act).  At step two, the ALJ found that Duran has severe impairments of status post a hangman's fracture of the cervical spine (at C2) with halo fixation, obesity, cervicalgia, degenerative disc disease of the cervical spine, and cervical spondylosis.  The ALJ also found that Duran has medically determinable but non-severe depression.  At step three, the ALJ found that Duran's impairments fail to meet or equal a listed impairment for presumptive disability under 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ found that, through the date last insured, Duran has the residual functional capacity ("RFC") "to perform and maintain a limited range of light work," and specifically to

> lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk (with normal breaks) for 6 hours in an 8-hour workday and sit for 6 hours (with normal breaks) in an 8-hour workday, with a required sit/stand option, enabling a change of position every 30 to 45 minutes; push/pull occasionally with both lower extremities; occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; frequently balance and occasionally stoop, kneel, crouch, or crawl; and (due to pain) understand, remember, and carry out simple instructions and perform simple tasks.

R. 41 (parenthesis in original).  At step four, the ALJ found that, through the date last

insured, Duran cannot perform her past relevant work as a polisher and buffer.[2]  At step five, where the burden shifts to the Commissioner, the ALJ found, based on the vocational expert's ("VE's") testimony, that Duran is capable of performing other jobs existing in significant numbers in the national economy, such as bakery worker, assembler, and inspector/hand packager.  Accordingly, the ALJ concluded that Duran has not been under a disability at any time between May 20, 2008 (alleged onset date) and March 31, 2013 (date last insured).

Duran maintains that the Commissioner's decision must be reversed on two grounds.  First, she contends that the RFC does not reflect all her limitations because the ALJ ignored record evidence establishing that she cannot perform light work.  Second, Duran posits that the ALJ erred at step five because the hypothetical question posed to the VE did not incorporate all of her limitations.

II

The court's review of the Commissioner's decision is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards to evaluate the evidence.  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (per curiam).  "The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court

---

[2]The ALJ noted that Duran described her past work as that of a sander, and she concluded that the closest occupational description in the Dictionary of Occupational Titles to that job was a polisher and buffer.

cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (footnotes omitted).

"The court may not reweigh the evidence or try the issues de novo or substitute its judgment for that of the [Commissioner]." *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984) (citations omitted). "If the Commissioner's findings are supported by substantial evidence, then the findings are conclusive and the Commissioner's decision must be affirmed." *Martinez*, 64 F.3d at 173. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It is more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993) (citing *Moore v. Sullivan*, 919 F.2d 901, 904 (5th Cir. 1990) (per curiam)). "To make a finding of 'no substantial evidence,' [the court] must conclude that there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983) (citation omitted). Even if the court should determine that the evidence preponderates in the claimant's favor, the court must still affirm the Commissioner's findings if there is substantial evidence to support these findings. *See Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985). The resolution of conflicting evidence is for the Commissioner rather than for the court. *See Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983) (per curiam).

For purposes of social security determinations, "disability" means an "inability to

- 4 -

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether an applicant is disabled, the Commissioner follows a five-step sequential analysis. *See, e.g., Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). If the Commissioner finds that the claimant is disabled or is not disabled at any step in the analysis, the analysis is terminated. *Id.* Under the five-step sequential inquiry the Commissioner considers whether (1) the claimant is presently engaged in substantial gainful activity, (2) the claimant's impairment is severe, (3) the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, (4) the impairment prevents the claimant from doing past relevant work, and (5) the claimant cannot presently perform relevant work that exists in significant numbers in the national economy. *See, e.g., Leggett*, 67 F.3d at 563 n.2; *Martinez*, 64 F.3d at 173-74; 20 C.F.R. § 404.1520(a)(4). "The burden of proof is on the claimant for the first four steps, but shifts to the [Commissioner] at step five." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (per curiam) (citing *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989) (per curiam)). At step five, once the Commissioner demonstrates that other jobs are available to a claimant, the burden of proof shifts to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (per curiam).

When determining the propriety of a decision of "not disabled," this court's function is to ascertain whether the record considered as a whole contains substantial evidence that

supports the final decision of the Commissioner, as trier of fact.  The court weighs four elements of proof to decide if there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) age, education, and work history. *Martinez*, 64 F.3d at 174 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam)).  "The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits."  *Ripley*, 67 F.3d at 557.  "If the ALJ does not satisfy [this] duty, [the] decision is not substantially justified."  *Id.*  Reversal of the Commissioner's decision is appropriate, however, "only if the applicant shows that [she] was prejudiced."  *Id.*  The court will not overturn a procedurally imperfect administrative ruling unless the substantive rights of a party have been prejudiced.  *See Smith v. Chater*, 962 F. Supp. 980, 984 (N.D. Tex. 1997) (Fitzwater, J.).

III

Duran contends that the physical limitations in the RFC are not supported by substantial evidence because record evidence shows that she cannot perform light work.[3]  She posits that the ALJ made two errors when formulating her RFC: first, the ALJ failed to consider the effects of the pain to Duran's neck, back, arms, and legs, and, second, the ALJ failed to consider that Duran's impairments are exacerbated by her obesity.

---

[3]Duran does not challenge the mental limitations in the RFC.

A

1

Duran asserts that the ALJ failed to consider the effects of pain to her neck, back, arms, and legs.  Duran points out that she testified that she was involved in a motor vehicle accident in May 2008 that resulted in injuries to her neck and right leg; that, after the accident, restrictions were placed on her to not lift any weight, not walk a lot, and not sit for long periods because of her neck and back, and she could not work anymore; that she has problems taking care of personal needs due to pain; that she has neck, leg, and back problems that interfere with lifting, sitting, standing, and walking long periods, and she can only walk about 10 minutes before needing to rest for at least 15 minutes; and that she has to take frequent breaks during the day.  Duran further posits that her medical records refer to her neck, back, arm, and leg pain.

The Commissioner responds that the ALJ based her RFC determination on the credible medical, testimonial, and documentary evidence of record, and substantial evidence supports the ALJ's determination that Duran can perform light work.  She points out that, after Duran was involved in the May 2008 motor vehicle accident, she underwent halo fixation to stabilize a fracture of her cervical spine at C2, and by August 2008, Duran's halo had been removed, X-rays of her cervical spine revealed that her vertebral bodies were in normal alignment, and no subluxations were visible with flexion or extensions.  The Commissioner further notes that Duran admitted that she did not seek treatment for her allegedly debilitating neck pain for approximately four years of the relevant period—from

August 2008 to August 2012.  And the Commissioner maintains that the findings of two treating physicians—Omar Hernandez, M.D. ("Dr. Hernandez"), a primary care physician, and Jesse Even, M.D. ("Dr. Even"), an orthopedist—that the ALJ relied on support the physical limitations in the RFC.  Additionally, the Commissioner avers that Duran relies almost exclusively on her own allegations of pain and other symptoms to support her complaint and presents no evidence from any physician to show that she had functional limitations that exceeded the limitations that the ALJ set forth in her RFC determination. The Commissioner maintains that the ALJ considered the factors that relate to the credibility of Duran's subjective complaints and properly found that her complaints were not entirely credible.

2

The ALJ concluded that Duran has the RFC "to perform and maintain a limited range of light work" and specifically to

> lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk (with normal breaks) for 6 hours in an 8-hour workday and sit for 6 hours (with normal breaks) in an 8-hour workday, with a required sit/stand option, enabling a change of position every 30 to 45 minutes; push/pull occasionally with both lower extremities; occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; frequently balance and occasionally stoop, kneel, crouch, or crawl; and (due to pain) understand, remember, and carry out simple instructions and perform simple tasks.

R. 41 (parenthesis in original).  And the ALJ noted that

> [t]here is no objective or other credible evidence to suggest inability to lift/carry 20 pounds. The sit/stand option, with a change of positions every 30 to 45 minutes, gives some credence to [Duran]'s allegations, and also gives [Duran] the benefit of any doubt. The actual medical evidence itself would not warrant such significant limitation. The postural limitations also give some credence to [Duran]'s allegations[.]

*Id.* at 44-45. In reaching this conclusion, the ALJ considered Duran's injuries stemming from the May 2008 motor vehicle accident, noting that Duran presented to an emergency room as a level-two trauma activation, was found to have a "hangman-type" fracture on the cervical spine at C2, and underwent halo fixation at that time. She further pointed out that, the day after the accident, a CT scan of Duran's head was essentially negative and showed that there was good alignment of the hangman's fracture, and cervical spine X-rays taken in August 2008 showed vertebral bodies that had maintained normal alignment in neutral position, no subluxations on flexion or extension, but some degenerative endplate changes from C5 to C7, and a note was made that Duran's halo had been removed.

The ALJ also discussed and relied on the findings of Dr. Hernandez. For example, at a well-woman examination with Dr. Hernandez in November 2008, Duran had no complaints, was not taking any medications, reported only moderate back pain (i.e., level 5 pain on a 10-point scale), and had full strength and normal sensation in all extremities, with intact and symmetrical deep tendon reflexes. And Dr. Hernandez rendered no diagnoses, but recommended regular exercise and weight loss. At a general physical exam with Dr. Hernandez in December 2011, Duran reported doing well with no complaints; denied back pain, joint pain, joint swelling, and muscle aches; her musculoskeletal examination showed

no deformity or scoliosis of the thoracic or lumbar spine; and she had full strength in all extremities and full range of motion in all joints.  In July 2012 Dr. Hernandez reported that Duran complained of back pain, which she had been treating with over-the-counter remedies, but denied lower extremity pain.  Additionally, Dr. Hernandez's general examination and "Detailed Back/Spine" examination were normal, Duran's straight-leg raising test was negative, she had no spinal or sciatic notch tenderness, and she had normal sensation and strength in her lower extremities.

The ALJ further discussed and relied on the findings of Dr. Even.  During an appointment with Dr. Even in August 2012, Duran reported non-radiating neck pain of 9 on a 10-point scale; stated that the pain was constant and aggravated by lifting, prolonged standing, straining, head turning activities, and driving; reported mid-back pain of 9 on a 10-point scale; stated that she was taking no medication; and denied a history of back or neck surgery.  Dr. Even found Duran's body habitus normal; examination of the cervical spine revealed no tenderness, swelling, deformities, instability, crepitus, or alterations of tone, but range of motion was restricted due to pain; paraspinal muscle strength and paraspinal muscle tone were within normal limits; examination of both upper extremities was normal; Duran had full motor strength; she had stable tandem gait without gross signs of myelopathy; Duran sat and stood without difficulty; spinal X-rays showed multi-level degenerative disc disease, especially at C5-6 and C6-7, but did not show signs of previous fractures or subluxations; and X-rays of the thoracic spine were negative for compression fractures or dislocations.  Dr. Even diagnosed Duran with cervicalgia/neck pain, cervical disc degeneration, and cervical

spondylosis without myelopathy; prescribed her Naprosyn; and scheduled her for a physical therapy consultation.  After six physical therapy sessions in August and September 2012, Duran rated her pain at 4 or 5 on a 10-point scale; an examination of the cervical spine was normal except for a mild limitation in range of motion secondary to pain; and Dr. Even noted that Duran had experienced "significant symptomatic relief" with the therapy and medication and that there had been an "overall improvement in symptoms."  R. 327-28.  In November 2012 Dr. Even's examination of Duran's cervical spine was negative except for a mild limitation in range of motion secondary to pain.  Dr. Even noted that "[Duran] [was] much improved after her physical therapy," and he instructed Duran to follow up with him on an as-needed basis.  *Id.* at 339-40.

Moreover, the ALJ noted that Duran testified that she fractured her cervical spine in the May 2008 motor vehicle accident; that she wore a halo fixation for three months; that she had arthritis in her cervical spine; that she did almost nothing due to pain; that she spent about six hours in bed during the day; that she got almost no sleep due to pain; that she had taken Naprosyn for pain and taken Hydrocodone when the pain was more severe; and that she is no longer seeing a provider.

The ALJ found, however, that "[Duran]'s statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible" because her testimony was generally inconsistent with the objective medical evidence.  *Id.* at 44.  In so finding, the ALJ observed that, "[a]s [Duran] acknowledged at a physical therapy session, she had no treatment for her neck pain for a period of about 4 years (roughly from August

- 11 -

2008 until she saw Dr. Even in August 2012)"; "[s]he did see Dr. Hernandez on several occasions during this period, but not specifically for neck pain"; and "[i]f [Duran]'s neck pain had been as severe as alleged, it is only reasonable that [she] would have sought and received more treatment during this period than she did." *Id.* (parenthesis in original).  The ALJ also found that Duran's statements with respect to the severity of symptoms were inconsistent with the duration and nature of her treatment since presentation to Dr. Even in August 2012, noting that:

> [Duran] saw Dr. Even for only 3 visits over about a 3-month period.  Treatment was of an entirely conservative nature (therapy and Naprosyn).  [Duran] has had no spinal surgery or injections.  At the time of the last visit (in November 2012), Dr. Even noted that [Duran]'s symptoms had improved significantly, and that he needed to see her only on an as-needed basis.  In addition, [Duran] was discharged from physical therapy in December 2012 for not having followed up in over a month.  If [Duran]'s symptoms (chiefly neck pain) were as severe as alleged, it is only reasonable to expect that [Duran] would have sought and received treatment for more than a 3-month period, that she would have returned to see Dr. Even later in 2012 and/or early in 2013.

*Id.* (parenthesis in original).  The ALJ also found that Duran's allegations as to severity of pain were inconsistent with Dr. Hernandez's reports.  She noted that "Dr. Hernandez typically identified few positive findings, and none that support the limitations alleged," and that Dr. Hernandez's examinations were sometimes "normal," such as the July 2012 "Detailed Back/Spine" examination.  *Id.*  And the ALJ found that her credibility determination was further supported by Duran's daily activities, including reading, sewing, shopping, and using a computer—"activities that suggest greater functional capacity than

[Duran] alleged." *Id.*  Finally, the ALJ concluded that Duran's medication regimen suggested that the allegations of pain were not entirely credible: she was on no pain medication, or only over-the-counter remedies, for significant periods, she was prescribed Hydrocodone in 2012 but was subsequently given Naprosyn, and Naprosyn was her only pain medication when she was seeing Dr. Even.

3

The ALJ sufficiently considered Duran's pain to her neck, back, arms, and legs. Critically, even though Duran does not challenge the ALJ's credibility determination, Duran relies on very little record evidence—other than her own testimony and medical records stating that she complained of pain—to establish greater physical limitations than are reflected in the RFC.  In fact, excluding her self-reports of pain, Duran only cites medical records detailing her injuries immediately after the 2008 accident, one of Dr. Hernandez's reports, and two of Dr. Even's reports.

As discussed above, the ALJ considered Duran's injuries stemming from the May 2008 motor vehicle accident, as well as the improvements of those injuries, and relied on the findings of Drs. Hernandez and Even.  And none of the reports by Drs. Hernandez and Even that Duran relies on support greater physical limitations than provided for in the RFC.  For example, Duran relies on Dr. Hernandez's July 2012 report in which he diagnosed her with "back pain," prescribed her Hydrocodone, and "discussed use of moist heat or ice, modified activities, medications, and stretching/strengthening exercises."  R. 263.  He also noted that "90% of patients with lower back pain will improve with time (2-6 weeks)," and directed

Duran to "[l]imit activity to comfort and avoid activities that increase discomfort." *Id.* at 264 (parenthesis in original). Further, as the ALJ pointed out, Dr. Hernandez concluded that Duran's physical examination, including the "Detailed Back/Spine" examination, was normal, and, his diagnosis was based on her subjective complaints, which the ALJ found to be not fully credible. And Dr. Hernandez's instructions do not require more physical limitations than detailed in the RFC.

Duran also cites two reports from Dr. Even. In August 2012 Dr. Even diagnosed Duran with cervicalgia/neck pain, cervical disc degeneration, and cervical spondylosis without myelopathy, but his examination findings (detailed above) were generally normal. He prescribed Naprosyn, and "[r]ecommend[ed] beginning Physical Therapy twice weekly [for] 4 weeks with attention to improved flexibility, core strength, pain-relieving modalities, and home exercise program." *Id.* at 282. Additionally, in September 2012 Dr. Even's examination of Duran's cervical spine was negative, except for a mild limitation in range of motion secondary to pain, and he continued to prescribe Naprosyn. "Considering the overall improvement in symptoms, [he] recommend[ed] that [Duran] continue conservative therapy, medications, and activity modification," and instructed her to follow up with him on an as-needed basis. *Id.* at 284. Dr. Even did not impose any physical limitations on Duran.

In formulating Duran's RFC, the ALJ relied on record evidence, including two treating physician's findings and Duran's daily activities. Duran has not pointed to any record evidence, other than her own testimony and reports, showing that she cannot perform the light work described in the ALJ's RFC determination. Accordingly, substantial evidence

supports the RFC determination.

## B

### 1

Duran maintains that the ALJ failed to consider that her obesity exacerbates her impairments. She posits that, at the time of her testimony, she was five feet, two inches tall, weighed two hundred and six pounds, and her body mass index (BMI) was 37.7, which put her at a high risk of developing obesity related impairments. She further asserts that obesity can cause physical limitations, and that the combined effect of obesity with other impairments may be greater than what might be expected without obesity.

In response, the Commissioner concedes that Duran was obese during the relevant period. But she points out that the mere presence of a condition does not confer a disability; instead, she contends that Duran must show that she was so functionally impaired that she could not perform any substantial gainful activity. The Commissioner maintains that Duran cites no evidence that obesity, alone or in combination with any other impairment, produced disabling functional limitations. Moreover, she contends that the ALJ explicitly evaluated Duran's obesity and accounted for the impact of her obesity when formulating the RFC.

### 2

The ALJ sufficiently considered Duran's obesity. "Obesity is a medically determinable impairment that the ALJ must consider in assessing a claimant's RFC." *Brown v. Astrue*, 2009 WL 64117, at *3 (N.D. Tex. Jan. 12, 2009) (Fitzwater, C.J.) (citing 20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.00(Q) (2008); *Policy Interpretation Ruling:*

*Titles II and XVI: Evaluation of Obesity*, SSR 02–01p, 2000 WL 628049, at *6-7 (S.S.A. 2002)). "Specifically, the ALJ must take into account the 'additional and cumulative effects' of obesity combined with other impairments, which 'can be greater than the effects of each of the impairments considered separately.'" *Id.* (quoting 20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.00(Q)).

In her decision, the ALJ explicitly discussed and considered Duran's obesity. She stated that the RFC "[was] based on [Duran]'s cervical spine impairments, which could be expected to have caused some pain, and that the pain could be expected to have been somewhat exacerbated by [her] *obesity*." R. 44 (emphasis added). She also stated that all of the limitations in the RFC "[took] into consideration the *obesity*." *Id.* at 45 (emphasis added). The ALJ also referred throughout her decision to Duran's weight and BMI, noting that Dr. Hernandez's November 2008 examination "showed that [Duran] weighed 208.2 pounds, at a height of 5'1" (for a BMI of 39.48)"; Dr. Hernandez's December 2011 examination "showed that [Duran] weighed 218 pounds (for a BMI of 41.34)"; Dr. Hernandez's July 2012 examination showed that "[Duran] weighed 202 pounds (for a BMI of 38.35)"; and Dr. Even's August 2012 examination "showed that [Duran] weighed 198 pounds, at a reported height of 5'2" (for a BMI of 36.21)." *Id.* at 42 (parenthesis in original). It is clear from the ALJ's decision that she factored Duran's obesity into the RFC determination. *Cf. Johnson v. Astrue*, 2010 WL 4722275, at *16-17 (N.D. Tex. Nov. 22, 2010) (Fitzwater, C.J.) (concluding that ALJ sufficiently considered claimant's obesity when determining RFC, even though ALJ did not explicitly articulate or rely on any cumulative

effects of claimant's obesity, because evidence of record indicated that her obesity was factored into RFC).

Moreover, Duran does not indicate what additional limitations she suffered as a result of her obesity, and she fails to cite any evidence showing that her obesity, alone or in combination with any other impairment, produced disabling functional limitations. *See id.* at *17 (explaining that, even if ALJ erred by failing to consider claimant's obesity, error was not reversible because claimant failed to show she was prejudiced as a result—that is, she failed to indicate what additional limitations she suffered as a result of her obesity).

Accordingly, the ALJ did not commit reversible error when considering Duran's obesity in determining the RFC.

IV

Duran contends that the ALJ's decision at step five is flawed because her decision was based on a defective hypothetical question posed to the VE.

A

Duran maintains that the ALJ's hypothetical question posed to the VE failed to include all her limitations. She avers that the ALJ merely requested that the VE consider a hypothetical person having "a marginal education level," without specifically defining her education level. Duran posits that, under the regulations, an education level includes both the claimant's ability to communicate in English and her ability to read or write. Duran asserts that she had to use a Spanish interpreter to testify, and she testified that she received a sixth grade education in Mexico. She further points out that the ALJ acknowledged in her

- 17 -

decision that Duran is not able to communicate in English and is considered illiterate.  Duran

avers that, had the VE considered her illiteracy and inability to communicate in English, she

would have found that Duran was not able to perform any of the identified jobs—bakery

worker, assembler, and inspector/hand packager—because, according to the Dictionary of

Occupational Titles (DOT), these jobs require the ability to write and speak simple sentences

and read approximately 2,500 two-to-three syllable words.  Because there is no record

evidence that she can perform these jobs, Duran maintains that the Commissioner has not

satisfied her burden at step five.

The Commissioner responds that substantial evidence supports the ALJ's

determination at step five.  She asserts that the hypothetical question presented to the VE in

post-hearing interrogatories addressed Duran's illiteracy and inability to communicate in

English, and the ALJ therefore properly relied on the VE's testimony to deny Duran's claim.

B

At step five, the Commissioner had the burden of showing that the claimant could

perform relevant work that existed in significant numbers in the national economy.  *See*

*Bowling*, 36 F.3d at 435.  To establish that such work exists, "the ALJ relies on the

medical-vocational guidelines or the testimony of a VE in response to a hypothetical

question."  *Vogt v. Astrue*, 2011 WL 5245421, at *13 (N.D. Tex. Nov. 2, 2011) (Ramirez,

J.) (citing *Bowling*, 36 F.3d at 435).  But

> [u]nless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions . . . a determination of non-disability based on such a defective question cannot stand.

*Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001) (quoting *Bowling*, 36 F.3d at 436). Further, "'[t]he regulations require the ALJ to evaluate a claimant's ability to speak, understand, and read and write in English when evaluating what work the claimant could perform.'" *Lopez v. Colvin*, 2015 WL 1473677, at *11 (N.D. Tex. Mar. 31, 2015) (Ramirez, J.) (quoting *Centeno v. Astrue*, 2012 WL 728073, at *5 (W.D. Tex. Mar. 5, 2012)); *see also* 20 C.F.R. § 404.1564(b)(6).

The ALJ posed hypothetical questions to the VE in the hearing and in post-hearing interrogatories. As Duran points out, the ALJ asked the VE in the hearing to consider a hypothetical individual who, among other things, has "a marginal education." R. 23.[4] But,

---

[4]In the hearing, the ALJ posed this hypothetical to the VE:

> I'd like for you to consider a hypothetical individual of [Duran]'s age, having a marginal education, having the same work experience as [Duran], with the following limitations: occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds; stand and/or walk, with normal breaks, a total of about six hours in an eight-hour work day; sit, with normal breaks, a total of about six hours in an eight-hour work day; requiring a sit-stand option, enabling an individual to change positions every 30 or 45 minutes; occasionally perform pushing and/or pulling activities with the bilateral lower extremities; occasionally perform climbing of ramps or stairs; never

in written post-hearing interrogatories, the ALJ asked the VE to consider a hypothetical individual who, among other things, "is not able to communicate in English[5] and is illiterate[6] in English as defined in 20 CFR 404.1564 and 416.964." *Id.* at 212.[7] In response,

_____

> climbing ladders, ropes, or scaffolds; frequently perform balancing; occasionally perform stooping, kneeling, crouching, or crawling; having the ability to understand, remember, and carry out simple instructions and perform simple tasks.

R. 23-24.

[5]Regarding the inability to communicate in English, 20 C.F.R. § 404.1564(b)(5) provides:

> Since the ability to speak, read and understand English is generally learned or increased at school, we may consider this an educational factor. Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language. Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do. It generally doesn't matter what other language a person may be fluent in.

[6]"Illiteracy" is defined as "the inability to read or write." 20 C.F.R. § 404.1564(b)(1). Further, "[w]e consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." *Id.*

[7]In post-hearing interrogatories, the ALJ posed this hypothetical to the VE:

> Assume a hypothetical individual who was born on April 30, 1964, is not able to communicate in English and is illiterate in English as defined in 20 CFR 404.1564 and 416.964, and has work experience as described in your response to question #6. Assume further that through the date last insured of March 31, 2013, this individual had the [RFC] to perform a limited range of light work. Specifically, through the date last insured, the

the VE opined that Duran could perform jobs that exist in the national economy, such as bakery worker, assembler, and inspector/hand packager.  The VE also checked the box stating that there are conflicts between the occupational evidence in this case and the occupational information contained in the DOT.

In the section of her decision discussing step five, the ALJ did not mention the hypothetical posed during the hearing.  Rather, she relied only on the VE's response to the post-hearing interrogatories.  She explained: "To determine the extent to which these limitations erode the unskilled light occupational base, through the date last insured, the [ALJ] asked the [VE], in post-hearing interrogatories, whether jobs existed in the national economy for an individual with [Duran]'s age, education (inability to communicate in English), work experience, and [RFC]."  *Id.* at 46 (parenthesis in original).  And the ALJ noted that "[t]he [VE] stated that given all of these factors, [Duran] would have been able to perform the requirements of such representative occupations as [bakery worker, assembler, and inspector/hand packager]."  *Id.*  Because the ALJ specifically defined Duran's

---

claimant was able to do the following: lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk (with normal breaks) for 6 hours in an 8-hour workday and sit for 6 hours (with normal breaks) in an 8-hour workday, with a required sit/stand option, enabling a change of position every 30 to 45 minutes; push/pull occasionally with both lower extremities; occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; frequently balance and occasionally stoop, kneel, crouch, or crawl; and understand, remember, and carry out simple instructions and perform simple tasks.

R. 212.

educational limits (i.e., an individual who "is not able to communicate in English and is illiterate in English as defined in 20 CFR 404.1564 and 416.964") in the post-hearing hypothetical (and because Duran does not assert that the ALJ failed to include any other limitations), the ALJ did not err in basing her decision at step five on the VE's response to that hypothetical.

*   *   *

For the reasons explained, the Commissioner's decision is

AFFIRMED.

July 19, 2016.

_____

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE